UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                          Case No. 23-CR-008

KEVIN MCCAA,

Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Margaret B. Honrath and Abbey M. Marzick, Assistant United States Attorneys, and the defendant, Kevin McCaa, individually and by attorneys Murali S. Jasti and Zaki Zehawi, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in four counts of a seven-count Indictment, which alleges violations of Title 18, United States Code, Sections 1111(a), 1114, 924(c), 922(g)(1), 924(a)(8), and 2(a), and Title 21, United States Code, Sections 846, 841(a), and 841(b)(1)(D).   The defendant is also charged in a two-count information, which alleges violations of Title 18, United States Code, Sections 1111(a), 1114, 924(c), and 2(a).

3.      The defendant has read and fully understands the charges contained in the indictment and information. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to waive prosecution by indictment in open court.

5. The defendant voluntarily agrees to plead guilty to the following counts in the Information set forth in full as follows:

**COUNT ONE**
(Second-Degree Murder)

**THE UNITED STATES ATTORNEY CHARGES THAT:**

On or about December 9, 2022, in the State and Eastern District of Wisconsin,

**KEVIN MCCAA,**

with malice aforethought, did unlawfully kill A.C., a United States Postal Service employee, while A.C. was engaged in and on account of the performance of his official duties.

In violation of Title 18, United States Code, Sections 1111(a), 1114, and 2(a).

**COUNT TWO**
(Discharge a Firearm During a Crime of Violence)

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

On or about December 9, 2022, in the State and Eastern District of Wisconsin,

**KEVIN MCCAA**

knowingly discharged a firearm during and in relation to a crime of violence, that is Second-Degree Murder as charged in Count One of this Information.

In violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2(a).

6. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and

2

establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7.     The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: Count One, up to life imprisonment and $250,000; and Count Two, up to life in prison and $250,000. Count Two also carries a mandatory minimum of 10 years of imprisonment, which must run consecutive to any other sentence. Each count also carries a mandatory special assessment of $100 and a maximum of five years of supervised release. The parties further recognize that a restitution order may be entered by the court.

8.     The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF INDICTMENT

9.     The government agrees to move to dismiss the indictment as to this defendant at the time of sentencing.

## ELEMENTS

10.     The parties understand and agree that in order to sustain the charge of Second-Degree Murder of a Postal Carrier, as set forth in Count One of the Information, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant or his accomplice unlawfully killed a person;

Second, the defendant or his accomplice killed with malice aforethought; and

Third, the victim was a United States Postal Service employee engaged in his official duties, or the murder was on account of his official duties.

3

A person acts with 'malice aforethought' if the person takes someone else's life deliberately and intentionally, or willfully acts with callous disregard for human life, knowing that a serious risk of death or serious bodily harm would result.

11. The parties understand and agree that in order to sustain the charge of Discharge of a Firearm in Furtherance of a Crime of Violence, as set forth in Count Two of the Information, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant used and carried a firearm during and in relation to second-degree murder of a United States Postal service employee, as charged in Count One of the Information, or the defendant had advance knowledge that his accomplice would knowingly use and carry a firearm during and in relation to second-degree murder of a United States Postal service employee, as charged in Count One of the Information; and

Second, the defendant, having such knowledge, intentionally facilitated the use and carrying of the firearm during and in relation to the second-degree murder; and

Third, the firearm was discharged during and in relation to the second-degree murder of the United States Postal Service Employee, as charged in Count One of the Information.

## SENTENCING PROVISIONS

12. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14. The defendant acknowledges and agrees that his attorney has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

15. The parties acknowledge and understand that prior to sentencing, the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty

4

plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

<b><u>Sentencing Guidelines Calculations</u></b>

16. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

<b><u>Relevant Conduct</u></b>

17. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

<b><u>Base Offense Level</u></b>

18. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One of the Information is 38 under Sentencing Guidelines Manual § 2A1.2. The parties understand and acknowledge that the guideline for the offense charged in Count Two of the Information is the 10-year mandatory minimum, consecutive to any other sentence, pursuant to Sentencing Guidelines Manual § 2K2.4(b).

5

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), and to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b), but only if the defendant exhibits conduct consistent with those provisions.

## Sentencing Recommendations

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.     The defendant understands and acknowledges that he will recommend a total sentence of 25 years in prison.  The defendant further understands and acknowledges that the government will recommend a total sentence of 35 years in prison.

## Court's Determinations at Sentencing

23.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

6

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26. The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form.

### Special Assessment

27. The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

### Restitution

28. The defendant agrees to pay restitution as ordered by the court, jointly and severally with his co-defendant Charles Ducksworth, Jr. The defendant further agrees that the $2,282 in U.S. currency recovered from 18XX North 13th Street, Milwaukee, Wisconsin, on December 27, 2022, should be applied toward restitution in this case. The defendant agrees not

7

to object to the transfer of that money from law enforcement custody to the Clerk of Courts to be applied to restitution. The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## Forfeiture

29.     The defendant agrees that all properties listed in the information were used to facilitate the offenses to which the defendant is pleading guilty. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## DEFENDANT'S WAIVER OF RIGHTS

30.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

   a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government

8

establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32. The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth

9

Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

34.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his conviction or sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

35.     The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations or venue.

### Further Civil or Administrative Action

36.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any

other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

37. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

38. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

39. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

40. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## Further Action by Internal Revenue Service

41. Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

11

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

42. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. Alternatively, the government may, in its discretion, ask the Court to be released from specific obligations under this plea agreement to reflect the defendant's conduct if the defendant commits a federal, state, or local offense punishable by a term of imprisonment exceeding one year or violates a material term of the plea agreement. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

43. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

12

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 6-22-26

KEVIN MCCAA
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 6/22/2026

MURALI JASTI
ZAKI ZEHAWI
Attorneys for Defendant

For the United States of America:

Date: 6/22/26

MARGARET B. HONRATH
ABBEY M. MARZICK
Assistant United States Attorneys

13

**ATTACHMENT A – Factual Proffer**

On Friday, December 9, 2022, at approximately 4:38 p.m., in the vicinity of 50XX North 65th Street in Milwaukee, Wisconsin, A.C. (hereinafter "the Victim") was working as a U.S. Postal Service letter carrier when he was approached from behind by a male subject, turned around, and was shot in the head a moment later. Ring doorbell audio and video footage captured the shooting. The Victim died on scene as a result of the single gunshot wound. A single bullet casing was located at the scene.

Law enforcement gathered surveillance footage from nearby residences, which showed the following activity. The car used by the shooter was a silver Audi Q5 SUV, with tinted windows and no visible license plates on the front or rear of the vehicle. The occupants of the Audi surveilled the Victim for at least 30 minutes leading up to his murder. The shooter walked from where the Audi parked in a nearby alley, through a residential yard, towards the Victim. He approached the Victim while the Victim delivered mail to a residence. When the shooter was within a few feet of the Victim, a single gunshot is heard, and the Victim fell to the ground. The shooter then ran back where he came from, towards the Audi. The shooter got into the driver's seat of the Audi. However, the Audi had already been started, the lights were turned on, and the vehicle was already in slight motion (indicating a second occupant) by the time the shooter entered the driver's seat. The Audi then fled the area at a high rate of speed. The shooter was wearing a distinct black and white, half camouflage hooded sweatshirt during the homicide. The sweatshirt was later determined to be a Bape brand sweatshirt, with a shark-tooth design on the hood.

Below is a still image from the backyard surveillance footage showing the shooter walking toward the block on which the Victim was delivering mail. The Audi is depicted to the left of the shooter.



Extensive historical cell site location data and phone records were obtained by agents, implicating Kevin McCaa and Charles Ducksworth, Jr., as the perpetrators of the murder. The phone location data is included at each relevant point in the factual summary below. The evidence established that McCaa had one cell phone, while Ducksworth had two cell phones, as of December 9, 2022.

Surveillance footage from various locations also captured the Audi fleeing the scene of the homicide. At approximately 4:42 p.m., the Audi was captured on surveillance footage in the area of a North 49th Street and West Parkway Drive. The footage showed the driver of the Audi stop near a pedestrian bridge over a creek, at which point an individual exited the Audi and walked towards the bridge, out of camera view. Ten days later, on December 19, 2022, officers canvassing this area located a black Glock 19 Generation 4 9mm semiautomatic handgun, bearing serial number BCRP667, without a magazine, submerged under water in the creek, near the pedestrian bridge. On December 21, 2022, a ballistics expert with the Wisconsin State Crime Lab compared this gun to the casing recovered from the scene of the homicide and determined that the casing matched the gun, meaning this was the gun used to kill the Victim. Cell site records for Ducksworth's phone (a flip phone that was located next to him at the time of his arrest on December 27, 2022) showed that the phone was in the area of the creek/parkway when the Audi was in the area and where the gun was discarded.

A few minutes after being near the pedestrian bridge, and about 10 minutes after the murder, at approximately 4:49 p.m., the Audi was next captured in footage entering the parking lot of a Boost Mobile store located at 4616 West Hampton Avenue in Milwaukee. Video showed the driver drop off the front seat passenger, who went into the store for about 10 minutes. The driver of the Audi was wearing clothing consistent with the shooter. The Audi still did not have license plates on it. A still image of the Audi outside the Boost Mobile is below:



Records for McCaa's and Ducksworth's phones show that the phone numbers on each of their primary devices were changed within minutes after the murder. McCaa's phone download showed that he received a text message at 4:52 p.m. from Boost Mobile indicating that his number had changed.

After the homicide, both McCaa's phone and Ducksworth's phones were near 45XX West Eggert Place, which was McCaa's residence at the time. Similarly, prior to the murder, both of their phones were utilizing a tower near McCaa's residence.

At about 7:22 p.m. on the night of the murder, the Audi was captured in footage pulling into a gas station 13 miles south of the murder, on Layton Avenue. McCaa's phone also contained searches with respect to the gas stations and gas prices around the same time. At that point, the Audi had license plates on it; however, the plates were reversed (i.e., the registration sticker was on front license plate rather than on the required rear plate). The gas station video showed that McCaa exited the driver's seat of the Audi, went into the gas station, then came back out, spoke with someone sitting in the front passenger seat of the Audi, and then went back into the gas station. Cell site records for both McCaa's and Ducksworth's phones are consistent with this travel from the north side of Milwaukee, to the south side, and back to the north side.

In the few days following the murder, there was extensive media coverage regarding the homicide of the Victim, and the media showed images of the Audi. On Monday, December 12, 2022, at approximately 7:19 a.m., officers located the Audi parked outside of 85XX West Grantosa Drive in Milwaukee. The Audi was registered to S.M., who resided at that location. S.M. was McCaa's girlfriend at the time and the mother of McCaa's child. The Audi matched all the characteristics of the Audi involved in the murder, including the design of the wheels, the slightly

3

darker looking front wheel rims, the front grill and fog lamps, and the misplaced/reversed license plates. Photos of the recovered Audi are below, including the mismatched plates:

 



Review of area license plate readers showed that in the days leading up to the homicide, the Audi traveled throughout the Milwaukee area with the license plates on and in the *correct* placement, with the registration sticker on the rear. The most recent date and time that the Audi was observed by license plate readers with plates in the correct placement was December 9, 2022, at 1:12 a.m., which was approximately 15 hours prior to the murder. A comparison photo of the homicide vehicle and the recovered Audi is below, showing the consistent damage to the front.



On December 12, 2022, Officers spoke with S.M., who claimed that she had used her Audi to deliver for DoorDash on the day and afternoon of the murder. S.M.'s claim was later determined

4

to be false, based on surveillance video of S.M. delivering DoorDash in an Acura (Ducksworth's vehicle) rather than the Audi around the time of the homicide.  Various video footage that was collected, which corresponds to the DoorDash records (including GPS), showed that S.M. was using Ducksworth's Acura for food deliveries between 4:35 p.m. and 7:59 p.m. on December 9, 2022.  Sometime after 7:59 p.m. and before 9:19 p.m., S.M. resumed driving the Audi for deliveries.  When questioned on December 12, 2022, S.M. had no explanation as to how, why, or when her license plates were switched.  The Audi was towed and processed for evidence. McCaa's fingerprint was located on the interior glass sunroof.

Agents located surveillance footage showing the Audi in front of S.M.'s residence on Grantosa at several points on the day of the murder. At about 2:07 a.m. on December 9, 2022, S.M. was seen exiting the driver's seat of the Audi and walking towards her residence. A male exited the front passenger seat and also walked towards S.M.'s residence.  The male was wearing the same clothing as the shooter, as shown in the video from the murder scene and at the Boost Mobile store 11 minutes after the murder. Multiple individuals familiar with McCaa have identified him in the footage outside S.M.'s apartment building on the day of the murder.



*Target Vehicle (Audi) and McCaa on December 9, 2022, at 2:07 a.m. outside GRANTOSA.*

At about 2:42 p.m. on December 9, 2022, the afternoon of the homicide, surveillance footage showed McCaa entering the Audi. He drove away in the Audi and returned to the same spot about five minutes later. Then, S.M. exited her residence and entered the front passenger seat of the Audi. McCaa then drove the Audi away from the area.



*McCaa approaching driver's area of Target Vehicle on December 9, 2022, at 2:42 p.m. outside GRANTOSA*



*S.M. approaching passenger area of Target Vehicle outside GRANTOSA on December 9, 2022, at approximately 2:47 p.m.*

Historical cell site location data shows McCaa's and S.M.'s phones in the area of the Grantosa residence at both of the above-described times. From the residence, at around 2:42 p.m., their phones travel to the area of McCaa's house on West Eggert Place. At that location, McCaa asked R.M. for some pliers to "fix" the license plates on the Audi. R.M. loaned McCaa the pliers shortly before 3:35 p.m.

6

In the days following the murder, agents reviewed United States Postal Service (USPS) business records and identified two suspect parcels scanned by the Victim. Parcel #1 was addressed to "Larry Ducksworth" at 64XX West Hampton Avenue in Milwaukee, the residence of Ducksworth's sister, L.D. That parcel was linked to another parcel, Parcel #2, which was addressed to "J.T." at 45XX West Eggert Place in Milwaukee, which is the residence directly next to McCaa's. The last names of each recipient for each parcel correspond to occupants at the respective addresses, but the first names do not. The shipping labels for both parcels were created on the same date (November 30, 2022) and time, have the same weight and dimensions, were mailed from Los Angeles, California, and the postage was paid in cryptocurrency. All these factors are indicia of shipping controlled substances.

According to USPS records, Parcel #1 was scanned by the Victim on December 2, 2022, at approximately 8:29 p.m. as, "Delivery Attempted – No Access to Delivery Location." Records further indicate the scan occurred 1.5 miles from the delivery address on West Hampton Avenue. Postal Inspectors went to the Victim's assigned post office and were unable to locate Parcel #1. Additionally, USPS records show that the tracking number for Parcel #1 was queried on USPS.com, and a customer requested text delivery notifications to 262-683-2033, which is Ducksworth's phone number. Cell site records put this phone in California on or about November 29, 2022,[1] and at the West Hampton location on December 2, 2022, the day Parcel #1 was supposed to be delivered. USPS records show that Parcel #2 was queried on December 3, 2022, and a customer requested text delivery notifications be sent to 414-975-4685, which is Kevin McCaa's phone number.

A review of USPS records showed that the residence *next to* McCaa's residence, 45XX West Eggert Place in Milwaukee, had received an additional four suspicious parcels, shipped between July 12, 2022, and December 1, 2022. USPS records also showed that the residence at 64XX West Hampton Avenue, where Ducksworth's sister lived, received an additional seven suspicious parcels, shipped between August 9, 2022, and November 30, 2022. Most of these parcels were addressed to either "Lamar Ducksworth" or "Larry Ducksworth." There were no individuals at the Hampton address with those first names. All these parcels (shipped to both West Eggert Place and West Hampton Avenue) had the same indicia of suspected drug trafficking as described above.

McCaa's phone records show that he was in contact with S.M. multiple times on the day of the murder, both before and after the murder. McCaa's last call before the murder was from S.M., at about 3:42 p.m. His first call after the murder was to S.M. at 4:59 p.m., which was approximately 21 minutes after the murder. McCaa had an additional seven calls with S.M. after the murder (combination of outgoing and incoming).

McCaa's phone records also show that he was in contact with Ducksworth on multiple occasions in the hours leading up to the murder (both incoming and outgoing). The last call before the murder was a call from Ducksworth to McCaa, which was approximately thirty minutes prior to the murder. Phone records also show that Ducksworth's and McCaa's phones were in contact

---

[1] Travel records and phone records reflect that McCaa and Ducksworth were in Las Vegas and California from November 29, 2022, until December 1, 2022. See more information about that trip below.

with one another on December 2, 2022, the day Parcel #1 was supposed to be delivered to Ducksworth's residence on West Hampton Avenue.

As mentioned above, business records for McCaa's and Ducksworth's cell phone provider and their phone downloads reflect that both McCaa and Ducksworth changed the phone numbers on their devices within approximately 20 minutes of the murder. The homicide occurred as 4:38 p.m., and McCaa changed his phone number at 4:52 p.m.

Historical cell site location data shows that in the hours leading up to the murder, Ducksworth's first phone was at 18XX North 13th Street in Milwaukee, and then it traveled to McCaa's residence on West Eggert Place. The location data for Ducksworth's second phone was consistent with the video surveillance summarized in this attachment, including the pre-homicide surveillance of the Victim and the discarding of the gun in the creek by the pedestrian bridge.

McCaa's new phone number and Ducksworth's flip phone number were consistent with being at the Boost Mobile approximately 11 minutes after the homicide, where the Audi was captured on surveillance footage at about the same time. Both of those phones were also near McCaa's residence on West Eggert Place approximately thirty minutes after the murder. There are no records for McCaa's phone after approximately 3:15 p.m. There were also no records for Ducksworth's phones from approximately 3:32 p.m. until around 5:00 p.m., which could indicate that both phones were off or in "airplane" mode during that time.

Five residential search warrants were executed on December 27, 2022 (*i.e.,* at the West Hampton Avenue residence, the West Grantosa Drive residence, the North 13th Street residence, and the two West Eggert Street addresses). McCaa and S.M. were located at the West Grantosa Drive residence and arrested during the execution of the search warrant. Law enforcement recovered two 9mm Glock magazines in the West Grantosa Drive living room, both of which are capable of fitting into a Glock 19 Gen4, which is the same firearm recovered from the creek and which did not contain a magazine. Law enforcement also recovered several rounds of .40 caliber ammunition from the living room, including: 16 Hornady Critical Defense .40 caliber rounds; 3 Winchester .40 caliber rounds; and 1 PAC brand .40 caliber round.

A search of 45XX West Eggert Place yielded clothing consistent with what McCaa wore in the gas station footage about three hours after the murder (*i.e.*, a black winter coat with fur hood, Nike Air Force One sneakers, and a shiny gold belt). In addition, from McCaa's bedroom, officers recovered multiple rounds of 9mm ammunition.

Ducksworth was located at the North 13th Street residence and arrested. Here, officers found a Glock 9mm pistol with a loaded drum magazine in a kitchen cabinet above the sink. Officers also recovered a large quantity of marijuana throughout the residence, including in the kitchen, packaged in a manner consistent with street-level distribution. The marijuana totaled over 700 grams. In addition, about 100 grams of marijuana wax in four jars was recovered from the front room of the house. Finally, hundreds of commercial grade marijuana packages, some of which were empty and some of which were full and sealed, were recovered from Ducksworth's

residence. A cell phone recovered near Ducksworth contained numerous text messages reflecting Ducksworth's distribution of marijuana.

Law enforcement also searched Ducksworth's Acura and found a sweatshirt that appeared consistent with the one the shooter wore, as seen on the surveillance video. The sweatshirt was in size Medium and is shown below:



As discussed below, both McCaa and Ducksworth purchased this sweatshirt when they were in Las Vegas and California paying their drug supplier for the recent shipment of marijuana. Footage from a traffic stop in Las Vegas shows that both of them were wearing this sweatshirt at the same time, as shown in the images below. According to the cooperating defendant, McCaa's sweatshirt was size XL, and he disposed of it after the homicide.

The initial preview of McCaa's phone (recovered at the time of his arrest) revealed a text message conversation between McCaa and Ducksworth (on McCaa's first number and Ducksworth's flip phone). The two exchanged messages about how the "mailman" did not deliver an expected package on December 2, 2022. They discussed confronting the mailman about the missing package. Ducksworth had a video of the Victim saved on his phone, showing the Victim delivering mail on December 2, 2022 (and *not* delivering the package) to 64XX West Hampton Avenue. The text conversation is indicative of the motive and intent behind the murder.

Portions of the text exchanges are provided below. This text message conversation between Ducksworth and McCaa occurred on December 2, 2022, between approximately 6:04 p.m. to 8:38 p.m.:

> DUCKSWORTH – Pulling up to kisha house
> MCCAA – It come

9

DUCKSWORTH – No
MCCAA – It's should be coming
MCCAA – The second one
MCCAA – U there tho right
DUCKSWORTH – Yup
MCCAA – There
DUCKSWORTH – No
DUCKSWORTH – Tmrw
MCCAA – I see
MCCAA – Wow
MCCAA – Make sure u got u see open because that's some new shit

From the conversation above, officers believe "kisha" is L.D., Charles Duckworth's older sister. It appears Ducksworth was telling McCaa that he arrived at L.D.'s residence on West Hampton Avenue on the day Subject Parcel #1 was expected to be delivered. Ducksworth advised McCaa the package was not delivered. In addition to McCaa's text above indicating Parcel #2 was delivered as expected, McCaa's phone also contained multiple outgoing text messages on December 4, 2022, in which he said he "got fire za," reflecting he had marijuana for sale.

On December 6, 2022, between approximately 4:15 p.m. and 5:59 p.m., McCaa and Ducksworth engaged in the following conversation via text messages:

DUCKSWORTH – Checking kisha cameras rn
MCCAA – I'm killing then fucked
MCCAA – Fuck that
MCCAA – Rec
MCCAA – 4 min
MCCAA – Show him the video him not dropping nothing
DUCKSWORTH – That's Friday at 2:43

In the text conversation above, Ducksworth appears to be viewing L.D.'s home surveillance videos. From McCaa's reply of "I'm killing then fucked," it appears McCaa was thinking about "killing" someone, meaning, "I'm killing that fucker." McCaa also asked Ducksworth to show "him," who is suspected to be the Victim, the video of the package not being delivered. Ducksworth's reply, which was, "That's Friday at 2:43," appears to be him referencing a time from L.D.'s surveillance video, which is consistent with USPS GPS records that showed that the Victim was in front of 64XX West Hampton Avenue on December 2, 2022, at approximately 2:43 p.m. This is the date and time McCaa and Ducksworth expected the Victim to deliver Subject Parcel #1 to 64XX West Hampton Avenue.

Between December 7, 2022, and December 8, 2022, the text conversation between McCaa and Ducksworth was as follows:

MCCAA – Did she give u the whole video
DUCKSWORTH – Going out there now to see the whole video
DUCKSWORTH – Out here
MCCAA – Wat she say

10

DUCKSWORTH – She said it's not him but he always leave his door open
DUCKSWORTH – She saying mailman
DUCKSWORTH – She said he ain't drop the mail
DUCKSWORTH – I'm on both they ass man  Ian trynna hear Kisha
MCCAA – Frfr
MCCAA – My phone off
MCCAA – I'm happy I got a I phone
DUCKSWORTH – He leave his door open so we runnin right in.
MCCAA – It's was him
MCCAA – Right
DUCKSWORTH – Kisha saying it's not but I'm goin to go see tmrw jus to make sure
MCCAA – Ok
MCCAA – I looked
DUCKSWORTH – Waitin on them to answer so I can shoot out there
DUCKSWORTH – He snitched on his self
DUCKSWORTH – Mail man
DUCKSWORTH – Kisha said she pulled up on him at 1 he said he dropped the box back at 8 then isha asked him was anybody outside at the time he laughed and said no then going to say my manager was jus talkin about that I sat it on the porch by the bushes.

In the text conversation above, Ducksworth and McCaa appear to be discussing surveillance video from L.D.'s residence, and specifically how it showed that the Victim did not deliver Subject Parcel #1.  It appears, based on the above text message conversation, that L.D. questioned the Victim about Subject Parcel #1 not being delivered, but the Victim told L.D. the parcel was delivered and that he had placed it on her porch by the bushes.

On December 12, 2022, Postal Inspector Chris Massari conducted an interview with R.M. R.M. stated that R.M. was a close family friend of the Victim and had known him for more than 20 years.  R.M. explained that R.M. spoke with the Victim on December 8, 2022, via telephone, while he was on his route delivering mail.  R.M. remembered hearing a customer repeatedly asking the Victim where her package was located.  R.M. could hear the Victim explain to the female customer that the package was placed near the bushes by her front door.  R.M. believed the customer was angry and aggressive because R.M. could hear the customer yelling at the Victim while they were on the phone together.  The statement from R.M. is consistent with what the Victim may have told L.D.

On December 28, 2022, United States Postal Inspectors Joshua Bergeron and Benjamin Whelan interviewed L.D.  They explained to L.D. that approximately eight suspicious USPS Priority Mail parcels had been sent to her residence since August 2022. L.D. claimed to have no knowledge of them, stating she was only aware of the parcels that she ordered from legitimate businesses.  L.D. allowed the Inspectors to view her surveillance video recordings, but the recordings only went back to December 25, 2022.  The Inspectors asked L.D. if she had a conversation with Ducksworth about whether a parcel arrived at her house on December 2, 2022. L.D. said Ducksworth did call her and inquired about a parcel he had shipped to her house, which he said contained a pair of shoes.  L.D. said that she told Ducksworth that his package was not delivered to her house.  L.D. recalled a conversation she had with her mailman (the Victim) in which she asked about a package she was expecting to arrive on December 7, 2022.  L.D. said she asked the mailman whether he recently delivered a package, which the mailman confirmed he had

done the previous evening at 8:00 p.m. In later interviews, L.D. admitted to sending Ducksworth the video footage that showed the mailman on December 2, 2022, delivering mail, but not a package, to her residence. L.D. was aware that both Ducksworth and Kevin McCaa were concerned that the package had not been delivered.

Ducksworth's flip phone contained a text message conversation on December 6, 2022, at approximately 5:14 p.m., between Ducksworth and L.D. L.D.'s phone number was saved as "Big Sis". "Big Sis" sent a video to Ducksworth with no additional text. The approximately 29 second video clip sent to Ducksworth showed the Victim delivering mail to the West Hampton Avenue address, but it did not show the Victim carrying or delivering a parcel. Based upon the other evidence collected, the video appeared to have been captured on December 2, 2022.

Text messages recovered from McCaa's phone reflected his and Ducksworth's travel to Las Vegas and California between November 29, 2022, and December 1, 2022. In addition, downloads of Ducksworth's phone and McCaa's phone reflect evidence of this trip, including their rental of a Mercedes which they drove between Las Vegas and California. On November 30, 2022, at approximately 1:15 p.m., McCaa and Ducksworth were stopped by Highway State Patrol in Las Vegas. McCaa was driving 103 mph in the rented Mercedes. During the stop, McCaa told the officer they were staying in Las Vegas and were going to Los Angeles to buy clothes and other items. Not only were the suspected drug parcels mailed from California during this time frame, but during the traffic stop, McCaa and Ducksworth were *both* wearing what appear to be identical hooded sweatshirts, with shark teeth on the hood and half camouflage/half black body portion. McCaa was wearing a dark blue jacket over his sweatshirt. A still image from the body cam footage is below. Further images show greater detail of the hooded sweatshirt, which is consistent in all respects with the shooter's sweatshirt. McCaa is in the driver's seat and Ducksworth is in the front passenger seat:







At least one cooperating witness ("CW") familiar with McCaa identified him in the homicide footage as the shooter of the Victim. The CW had seen the news coverage for the homicide. When the CW saw the footage showing the suspect vehicle, the CW recognized the car to be S.M.'s Audi. The CW also saw footage of the shooter running from the homicide back to the Audi, and the CW believed it to be Kevin McCaa based upon the person's build and what appeared to be long hair bouncing behind the person, and the CW knew Kevin McCaa had long dreadlocks.

Another CW also implicated Kevin McCaa as the shooter in the homicide. The CW reported that not only did Kevin McCaa and Charles Ducksworth, Jr., surveil the Victim on the afternoon of the homicide, who Kevin McCaa eventually shot in the head, but McCaa and Ducksworth also surveilled him leaving work from the Hampton Street Post Office the evening *before* the homicide. According to the CW, McCaa wanted to "track down and kill" the Victim because of the missing drug package. The CW reported that, on the evening prior to the homicide, McCaa and Ducksworth observed the Victim get picked up by someone in an SUV. Ducksworth drove his Acura and followed the SUV for several blocks. Eventually, the SUV pulled over and

Ducksworth parked behind the SUV.  According to the CW, McCaa got out of the Acura with his Glock handgun and began to approach the SUV when it drove off.  They decided not to follow the SUV on that evening.