UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                                      Case No. 23-CR-008

CHARLES DUCKSWORTH, JR.,

Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Margaret B. Honrath and Abbey M. Marzick, Assistant United States Attorneys, and the defendant, Charles Ducksworth, Jr., individually and by attorney Michael Chernin, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in four counts of a seven-count Indictment, which alleges violations of Title 18, United States Code, Section 1111(a), 1114, 924(c), 924(j), and 2(a), and Title 21, United States Code, Sections 841(a) and 841(b)(1)(C).  The defendant is also charged in a two-count information, which alleges violations of Title 18, United States Code, Sections 1111(a), 1114, 924(c), and 2(a).

3.      The defendant has read and fully understands the charges contained in the indictment and information. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.　　The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.　　The defendant voluntarily agrees to plead guilty to the following counts in the Information set forth in full as follows:

### COUNT ONE
(Second-Degree Murder)

**THE UNITED STATES ATTORNEY CHARGES THAT:**

On or about December 9, 2022, in the State and Eastern District of Wisconsin,

**CHARLES DUCKSWORTH, JR.,**

with malice aforethought, did unlawfully kill A.C., a United States Postal Service employee, while A.C. was engaged in and on account of the performance of his official duties.

In violation of Title 18, United States Code, Sections 1111(a), 1114, and 2(a).

### COUNT TWO
(Discharge a Firearm During a Crime of Violence)

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

On or about December 9, 2022, in the State and Eastern District of Wisconsin,

**CHARLES DUCKSWORTH, JR.**

knowingly discharged a firearm during and in relation to a crime of violence, that is Second-Degree Murder as charged in Count One of this Information.

In violation of Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2(a).

6.　　The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offenses described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and

2

establish his guilt beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, these offenses.

## PENALTIES

7. The parties understand and agree that the offenses to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: Count One, up to life imprisonment and $250,000; and Count Two, up to life in prison and $250,000. Count Two also carries a mandatory minimum of 10 years of imprisonment, which must run consecutive to any other sentence. Each count also carries a mandatory special assessment of $100 and a maximum of five years of supervised release. The parties further recognize that a restitution order may be entered by the court.

8. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF INDICTMENT

9. The government agrees to move to dismiss the indictment as to this defendant at the time of sentencing.

## ELEMENTS

10. The parties understand and agree that in order to sustain the charge of Second Degree Murder of a Postal Carrier, as set forth in Count One of the Information, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant or his accomplice unlawfully killed a person;

Second, the defendant or his accomplice killed with malice aforethought; and

Third, the victim was a United States Postal Service employee engaged in his official duties or the murder was on an account of his official duties.

3

"A person acts with 'malice aforethought' if the person takes someone else's life deliberately and intentionally, or willfully acts with callous disregard for human life, knowing that a serious risk of death or serious bodily harm would result."

11. The parties understand and agree that in order to sustain the charge of Discharge of a Firearm in Furtherance of a Crime of Violence, as set forth in Count Two of the Information, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant either used or carried a firearm or had advance knowledge that his accomplice would knowingly use and carry a firearm during and in relation to second degree murder of a United States Postal service employee, as charged in Count One of the Information; and

Second, the defendant, having such knowledge, intentionally facilitated the use and carrying of the firearm during and in relation to the second degree murder; and

Third, the firearm was discharged during and in relation to the second degree murder of the United States Postal Service Employee, as charged in Count One of the Information.

## SENTENCING PROVISIONS

12. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14. The defendant acknowledges and agrees that his attorney has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

15. The parties acknowledge and understand that prior to sentencing, the United States Probation Office will conduct its own investigation of the defendant's criminal history.

4

The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

16.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

17.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Base Offense Level

18.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One of the Information is 38 under Sentencing Guidelines Manual § 2A1.2.  The parties understand and acknowledge that the guideline for the offense charged in Count Two of the Information is the 10-year mandatory minimum, consecutive to any other sentence, pursuant to Sentencing Guidelines Manual § 2K2.4(b).

## Acceptance of Responsibility

5

19.    The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.  In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

<u>**Sentencing Recommendations**</u>

20.    Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.    Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.    The government agrees to recommend a sentence within the sentencing guideline range, as determined by the court.

<u>**Court's Determinations at Sentencing**</u>

23.    The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court

6

will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26. The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form.

### Special Assessment

27. The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

### Restitution

28. The defendant agrees to pay restitution as ordered by the court, jointly and severally with his co-defendant Kevin McCaa. The defendant further agrees that the $2,282 in

7

U.S. currency recovered from 18XX North 13th Street, Milwaukee, Wisconsin, on December 27, 2022, should be applied toward restitution in this case. The defendant agrees not to object to the transfer of that money from law enforcement custody to the Clerk of Courts to be applied to restitution. The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## Forfeiture

29.     The defendant agrees that all properties listed in the information were used to facilitate the offenses to which the defendant is pleading guilty. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## DEFENDANT'S COOPERATION

30.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The parties acknowledge, understand, and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own

8

determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

**DEFENDANT'S WAIVER OF RIGHTS**

31. In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

9

32. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

33. The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

34. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

35. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his conviction or sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim

10

that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

36. The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations or venue.

<u>**Further Civil or Administrative Action**</u>

37. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

<u>**GENERAL MATTERS**</u>

38. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

39. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

11

40. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

41. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### Further Action by Internal Revenue Service

42. Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

### EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

43. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands,

12

however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

44. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

13

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 6 | 25 | 26

CHARLES DUCKSWORTH, JR.
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 06 / 25 / 26

MICHAEL CHERNIN
Attorney for Defendant    SBN /002 08)

For the United States of America:

Date: 6/24/26

MARGARET B. HONRATH
ABBEY M. MARZICK
Assistant United States Attorneys

14

*United States v. Charles Ducksworth, Jr.*, EDWI Case No. 23-CR-008 (PP)

## ATTACHMENT A – Factual Proffer

On Friday, December 9, 2022, at approximately 4:38 p.m., in the vicinity of 50XX North 65th Street in Milwaukee, Wisconsin, A.C. (hereinafter "the Victim") was working as a U.S. Postal Service letter carrier when he was approached from behind by a male subject and shot in the head. The Victim died on scene as a result of the single gunshot wound. A single bullet casing was located at the scene.

Law enforcement gathered surveillance footage from nearby residences, which showed the following activity. The car used by the shooter was a silver Audi Q5 SUV, with tinted windows and no visible license plates on the front or rear of the vehicle. The occupants of the Audi surveilled the Victim for at least 30 minutes leading up to his murder. The shooter walked from where the Audi parked, through a residential yard, towards the Victim. He approached the Victim while the Victim delivered mail to a residence. When the shooter was within a few feet of the Victim, a single gunshot is heard, and the Victim falls to the ground. The shooter then ran back where he came from, towards the Audi. The shooter got into the driver's seat of the Audi, although the Audi was already in slight motion (indicating a second occupant), and the Audi fled the area at a high rate of speed. The shooter was wearing a distinct black and white, half camouflage sweatshirt during the homicide.

Below is a still image from the enhanced surveillance footage showing the shooter walking toward the block on which the Victim was delivering mail. The Audi is depicted to the left of the shooter.



Extensive historical cell site location data and phone records were obtained by agents, implicating Kevin McCaa and Charles Ducksworth, Jr., as the perpetrators of this murder. The phone location data is included at each relevant point below.

Surveillance footage from various locations also captured the Audi fleeing the scene of the homicide and driving towards the area of North 49th Street and West Parkway Drive. The driver of the Audi parked near a pedestrian bridge over a creek, at which point an individual exited the Audi and walked towards the bridge, out of camera view. Ten days later, on December 19, 2022, officers canvassing this area located a black Glock 19 Generation 4 9mm semiautomatic handgun, serial number BCRP667, without a magazine, submerged under water in the creek, near the pedestrian bridge. On December 21, 2022, a ballistics expert with the Wisconsin State Crime Lab compared this gun to the casing recovered from the scene of the homicide and determined that the casing matched the gun. Cell site records for Ducksworth's phone (a flip phone that was located next to him at the time of his arrest on December 27, 2022) showed that the phone was in the area of the creek/parkway when the Audi was in the area and where the gun was discarded.

A few minutes after being in the area of the pedestrian bridge and about 10 minutes after the murder, the Audi is next captured in footage entering the parking lot of a Boost Mobile store located at 4616 West Hampton Avenue in Milwaukee. Video showed the driver dropping off the front seat passenger, who goes into the store for about 10 minutes. The driver of the Audi is wearing clothing consistent with the shooter. The Audi still did not have license plates on it. A still image of the Audi outside the Boost Mobile with the driver wearing the half camouflage sweatshirt is below:



2

Records for McCaa's and Ducksworth's phones show that the phone numbers on each of their primary devices were changed shortly after the murder. McCaa's phone download showed that he received a text message at 4:52 p.m. from Boost Mobile indicating that his number had changed.

At about 7:22 p.m. on the night of the murder, the Audi is captured in footage pulling into a gas station 13 miles south of the murder. At that point, the Audi had license plates on it; however, the plates were reversed (i.e., the registration sticker was on front license plate rather than on the required rear plate). The gas station video showed that McCaa exited the driver's seat of the Audi, went into the gas station, then came back out, spoke with someone sitting in the front passenger seat of the Audi, and then went back into the gas station. Cell site records for both McCaa's and Ducksworth's phones are consistent with this travel from the north side of Milwaukee, to the south side, and back to the north side.

In the few days following the murder, there was extensive media coverage regarding the homicide of the postal carrier, and the media showed images of the Audi. On Monday, December 12, 2022, at approximately 7:19 a.m., officers located the Audi outside of 85XX West Grantosa Drive in Milwaukee. The Audi was registered to Shanelle McCoy, who resided at that location. McCoy was McCaa's girlfriend at the time and the mother of McCaa's child. The Audi matched all the characteristics of the Audi involved in the murder, including the design of the wheels, the slightly darker looking front wheel rims, the front grill and fog lamps, and the misplaced license plates. Photos of the recovered Audi are below, including the mismatched plates:

 



Review of area license plate readers showed that in the days leading up to the homicide, the Audi traveled throughout the Milwaukee area with the license plates on and in the *correct* placement.

3

The most recent date and time that the Audi was observed by license plate readers with plates in the correct placement was December 9, 2022, at 1:12 a.m., or about 15 hours prior to the murder. A comparison photo of the homicide vehicle and the recovered Audi is below, showing the consistent damage to the front.



On December 12, 2022, Officers spoke with McCoy, who claimed that she had used her Audi to deliver for DoorDash on the day/afternoon of the murder. This was later determined to be untrue, based on surveillance video of McCoy delivering DoorDash in an Acura (Ducksworth's vehicle) rather than the Audi. Various video footage collected, which corresponds to the DoorDash records (including GPS), showed that McCoy was using the Acura for deliveries between 4:35 p.m. and 7:59 p.m. on December 9, 2022. Sometime after 7:59 p.m. and before 9:19 p.m., McCoy resumed driving the Audi for deliveries. When questioned on December 12, 2022, McCoy had no explanation as to how, why, or when her license plates were switched. The Audi was towed and processed for evidence. McCaa's fingerprint was located on the interior glass sunroof.

Agents located surveillance footage showing the Audi in front of McCoy's residence on Grantosa at several points on the day of the murder. At about 2:07 a.m. on December 9, 2022, McCoy is seen exiting the driver's seat of the Audi and walking towards her residence. A male exits the front passenger seat and also walks towards McCoy's residence. The male is wearing the same clothing as the shooter, as shown in the video from the murder scene and at the Boost Mobile store 11 minutes after the murder. Multiple individuals familiar with McCaa have identified him in the footage outside McCoy's apartment building on the day of the murder.

4



*Target Vehicle and McCaa on December 9, 2022, at 2:07 a.m. outside GRANTOSA.*

At about 2:42 p.m. on December 9, 2022, the afternoon of the homicide, surveillance footage showed McCaa entering the Audi. He drove away in the Audi and returned to the same spot about five minutes later. Then, McCoy exited her residence and entered the front passenger seat of the Audi. McCaa drove the Audi away from the area.



*McCaa approaching driver's area of Target Vehicle on December 9, 2022, at 2:42 p.m. outside GRANTOSA*

5



*McCoy approaching passenger area of Target Vehicle outside GRANTOSA on December 9, 2022, at approximately 2:47 p.m.*

Historical cell site location data shows McCaa's and McCoy's phones in the area of the Grantosa residence at both of the above-described times. From the residence, at around 2:42 p.m., their phones travel to the area of McCaa's house on West Eggert Place. At that location, McCaa asked R.M. for some pliers to "fix" the license plates on the Audi. R.M. loaned McCaa the pliers shortly before 3:35 p.m.

In the days following the murder, agents reviewed USPS business records and identified suspect parcels scanned by the Victim. Parcel #1 was addressed to "Larry Ducksworth" at 64XX W. Hampton Avenue in Milwaukee, the residence of Duckworth's sister, Lakisha Ducksworth. That parcel was linked to another parcel, Parcel #2, which was addressed to "Jay Thompson" at 45XX West Eggert Place in Milwaukee, which is the residence directly next to McCaa's. The last names of each recipient for each parcel correspond to occupants at the respective addresses, but the first names do not. The shipping labels for both parcels were created on the same date (November 30, 2022) and time, have the same weight and dimensions, were mailed from Los Angeles, California, and postage was paid in cryptocurrency. All these factors are indicia of shipping controlled substances.

According to USPS records, Parcel #1 was scanned by the Victim on December 2, 2022, at approximately 8:29 p.m. as, "Delivery Attempted – No Access to Delivery Location." Records further indicate the scan occurred 1.5 miles from the delivery address on W. Hampton. Postal Inspectors went to the Victim's assigned post office and were unable to locate Parcel #1. Additionally, USPS records show that the tracking number for Parcel #1 was queried on USPS.com and a customer requested text delivery notifications to 262-683-2033, which is Duckworth's phone number. Cell site records put this phone in California on or about November 29, 2022[1], and

---

[1] Travel records and phone records reflect that McCaa and Ducksworth were in Las Vegas and California from November 29, 2022, until December 1, 2022. See more information about that trip below.

6

at the West Hampton location on December 2, 2022, the day Parcel #1 was supposed to be delivered. USPS records show that Parcel #2 was queried on December 3, 2022, and a customer requested text delivery notifications be sent to 414-975-4685, which is Kevin McCaa's phone number.

A review of USPS records showed that the residence *next to* McCaa's residence, 45XX W. Eggert Place in Milwaukee, had received an additional four suspicious parcels, shipped between July 12, 2022, and December 1, 2022. USPS records also showed that the residence at 64XX W. Hampton Avenue, where Ducksworth's sister lives, has received an additional seven suspicious parcels, shipped between August 9, 2022, and November 30, 2022. Most of these parcels were addressed to either "Lamar Ducksworth" or "Larry Ducksworth." There are no individuals at the Hampton address with those first names. All these parcels (shipped to both West Eggert Place and West Hampton Avenue) had the same indicia of suspected drug trafficking as described above.

McCaa's phone records show that he was in contact with McCoy multiple times on the day of the murder, both before and after the murder. McCaa's last call before the murder was received from McCoy, at about 3:42 p.m. His first call after the murder was to McCoy, which was 21 minutes after the murder. McCaa had an additional seven calls with McCoy after the murder (combination of outgoing and incoming). McCaa's phone records also show that he was in contact with Ducksworth on multiple occasions in the hours leading up to the murder (both incoming and outgoing). The last call before the murder was a call from Ducksworth to McCaa, 30 minutes prior to the murder. Phone records also show that Ducksworth's and McCaa's phones were in contact with one another on December 2, 2022, the day Parcel #1 was supposed to be delivered to Ducksworth's residence on W. Hampton.

Business records for McCaa's and Ducksworth's cell phone provider and their phone downloads reflect that both McCaa and Ducksworth changed the phone numbers on their devices soon after the murder.

Historical cell site location data shows that in the hours leading up to the murder, Ducksworth's first phone number was at 18XX N. 13th Street in Milwaukee and then traveled to McCaa's residence on West Eggert Place. The location data for Ducksworth's second phone number was consistent with the video surveillance summarized in this attachment, including the pre-homicide surveillance of the Victim and the discarding of the gun in the creek by the pedestrian bridge. McCaa's new number and Ducksworth's flip phone number were consistent with being at the Boost Mobile 11 minutes after the homicide, where and when the Audi was captured on surveillance footage. Both of those phones were also in the area of McCaa's residence on West Eggert Place approximately 30 minutes after the murder.

Five residential search warrants were executed on December 27, 2022 (i.e., the West Hampton Avenue residence, the West Grantosa Drive residence, the North 13th Street residence, and the two West Eggert Street addresses). McCaa and McCoy were located at the West Grantosa residence and arrested. Two 9mm Glock magazines were recovered in the West Grantosa living

7

room, both of which are capable of fitting into a Glock 19 Gen4, the same firearm recovered from the creek, which did not contain a magazine. Several rounds of .40 caliber ammunition were also recovered from the living room, including: 16 Hornady Critical Defense .40 caliber rounds; 3 Winchester .40 caliber rounds; and 1 PAC brand .40 caliber round.

A search of 45XX W. Eggert Place yielded clothing consistent with what McCaa wore in the gas station footage about three hours after the murder (i.e., black winter coat with fur hood, Nike Air Force One sneakers, and a shiny gold belt).

Ducksworth was located at the North 13th Street residence and arrested. Here, officers found a Glock 9mm pistol with a loaded drum magazine in a kitchen cabinet above the sink. Officers also recovered a large quantity of marijuana throughout the residence, including in the kitchen, packaged in a manner consistent with street-level distribution. The marijuana totaled over 700 grams. In addition, about 100 grams of marijuana wax in four jars was recovered from the front room of the house. Finally, hundreds of commercial grade marijuana packages, some empty and some full/sealed, were recovered from Ducksworth's residence. A cell phone recovered near Ducksworth contained numerous text messages reflecting Ducksworth's distribution of marijuana.

Ducksworth's Acura was also searched and inside, officers located a distinct sweatshirt consistent with the one the shooter wore, as seen on the surveillance video. The sweatshirt is shown below:



The initial preview of McCaa's phone (recovered at the time of his arrest) revealed a text message conversation between McCaa and Ducksworth (on McCaa's first number and Ducksworth's flip phone). The two discuss how the "mailman" did not deliver an expected package

8

on December 2, 2022. They discuss confronting the mailman about the missing package. Ducksworth had a video of the Victim saved on his phone, showing the Victim delivering mail on December 2, 2022 (and *not* delivering the package) to 64XX W. Hampton Avenue. The text conversation is indicative of the motive and intent behind the murder.

Portions of the text exchanges are provided below. Text message conversation between Ducksworth and McCaa on December 2, 2022, between approximately 6:04 p.m. to 8:38 p.m.:

> DUCKSWORTH – Pulling up to kisha house
> MCCAA – It come
> DUCKSWORTH – No
> MCCAA – It's should be coming
> MCCAA – The second one
> MCCAA – U there tho right
> DUCKSWORTH – Yup
> MCCAA – There
> DUCKSWORTH – No
> DUCKSWORTH – Tmrw
> MCCAA – I see
> MCCAA – Wow
> MCCAA – Make sure u got u see open because that's some new shit

From the conversation above, officers believe "kisha" is Lakisha Ducksworth, Charles Duckworth Jr.'s older sister. It appears Ducksworth, Jr. was telling McCaa that he arrived at Lakisha's residence on West Hampton Avenue on the day Subject Parcel #1 was expected to be delivered. Ducksworth, Jr. advised McCaa the package was not delivered. In addition to McCaa's text above indicating Parcel #2 was delivered as expected, McCaa's phone also contained multiple outgoing texts on December 4, 2022, in which he says he "got fire za," reflecting he had marijuana for sale.

On December 6, 2022, between approximately 4:15 p.m. and 5:59 p.m., the text conversation between McCaa and Ducksworth included as follows:

> DUCKSWORTH – Checking kisha cameras rn
> MCCAA – I'm killing then fucked
> MCCAA – Fuck that
> MCCAA – Rec
> MCCAA – 4 min
> MCCAA – Show him the video him not dropping nothing
> DUCKSWORTH – That's Friday at 2:43

In the text conversation above, Ducksworth, Jr. appears to be viewing Lakisha's home surveillance cameras. From McCaa's reply of "I'm killing then fucked," it appears McCaa was thinking about "killing" someone; he possibly meant to say, "I'm killing that fucker." McCaa also asked Ducksworth, Jr. to show "him," who is suspected to be the Victim, the video of the package not being delivered. Ducksworth, Jr.'s reply of "That's Friday at 2:43" appears to be him

9

referencing a time from Lakisha's surveillance video, which is consistent with USPS business records which show the Victim was in front of 64XX W. Hampton Avenue on December 2, 2022, at approximately 2:43 p.m. This is the date and time McCaa and Ducksworth, Jr. expected the Victim to delivery Subject Parcel #1 to 64XX W. Hampton.

Between December 7, 2022, and December 8, 2022, the text conversation between McCaa and Ducksworth was as follows:

> MCCAA – Did she give u the whole video
> DUCKSWORTH – Going out there now to see the whole video
> DUCKSWORTH – Out here
> MCCAA – Wat she say
> DUCKSWORTH – She said it's not him but he always leave his door open
> DUCKSWORTH – She saying mailman
> DUCKSWORTH – She said he ain't drop the mail
> DUCKSWORTH – I'm on both they ass man  Ian trynna hear Kisha
> MCCAA – Frfr
> MCCAA – My phone off
> MCCAA – I'm happy I got a I phone
> DUCKSWORTH – He leave his door open so we runnin right in.
> MCCAA – It's was him
> MCCAA – Right
> DUCKSWORTH – Kisha saying it's not but I'm goin to go see tmrw jus to make sure
> MCCAA – Ok
> MCCAA – I looked
> DUCKSWORTH – Waitin on them to answer so I can shoot out there
> DUCKSWORTH – He snitched on his self
> DUCKSWORTH – Mail man
> DUCKSWORTH – Kisha said she pulled up on him at 1 he said he dropped the box back at 8 then isha asked him was anybody outside at the time he laughed and said no then going to say my manager was jus talkin about that I sat it on the porch by the bushes.

In the text conversation above, Ducksworth, Jr. and McCaa appear to be discussing surveillance video from Lakisha's residence and how the Victim did not deliver Subject Parcel #1. It appears Lakisha questioned the Victim about Subject Parcel #1 not being delivered, but the Victim told Lakisha the parcel was delivered and placed it on her porch by the bushes.

On December 12, 2022, Postal Inspector Chris Massari conducted an interview with R.M. R.M. stated that R.M. was a close family friend of the Victim and had known him for more than 20 years. R.M. explained that R.M. was speaking with the Victim on December 8, 2022, via telephone, while he was on his route delivering mail. R.M. remembered hearing a customer repeatedly ask the Victim where her package was. R.M. could hear the Victim explain to the female customer that the package was placed near the bushes by her front door. R.M. believed the customer was angry and aggressive because she could hear the customer yelling at the Victim while they were on the phone together. The statement from R.M. is consistent with what the Victim may have told Lakisha.

10

On December 28, 2022, United States Postal Inspectors Joshua Bergeron and Benjamin Whelan interviewed Lakisha. Inspectors explained to Lakisha that approximately eight suspicious USPS Priority Mail parcels had been sent to her residence since August of 2022. Lakisha claimed to have no knowledge of them, stating she was only aware of the parcels she was ordering from legitimate businesses. Lakisha allowed Inspectors to view her surveillance video recordings, but the recordings only went back to December 25, 2022. Lakisha was asked if she had a conversation with Ducksworth, Jr. about a parcel arriving or not arriving at her house on December 2, 2022. Lakisha stated Ducksworth, Jr. did call her and inquired about a parcel he had shipped to her house, which he said contained a pair of shoes. Lakisha stated she told Ducksworth, Jr. that his package did not get delivered to her house. Lakisha recalled a conversation she had with her mailman and stated she asked her mailman about a package she was expecting to arrive on December 7, 2022. Lakisha stated she asked the mailman if he recently delivered a package, which the mailman confirmed he had done the previous evening at 8:00 p.m.

Ducksworth, Jr.'s flip phone contained a text conversation on December 6, 2022, at approximately 5:14 p.m., between Ducksworth, Jr. and Lakisha. Lakisha's phone number was saved as "Big Sis". "Big Sis" sent a video to Ducksworth, Jr. with no additional text. The approximately 29 second video clip sent to Ducksworth, Jr. shows a USPS Letter Carrier delivering mail to the West Hampton Avenue address. The video also shows "Vivint" in the bottom left corner, which is the company that Lakisha reported was associated with her "broken" security system. Three USPS employees, L.S., A.L., and A.A., were all interviewed separately, and each identified the Letter Carrier shown in the still image as the Victim. The Victim is shown delivering mail to Lakisha's residence, and the Victim is not seen carrying or delivering any parcels. Based upon the other evidence collected, the video appeared to have been captured on December 2, 2022.

Text messages recovered from McCaa's phone reflected his and Ducksworth, Jr.'s travel to Las Vegas and California between November 29, 2022, and December 1, 2022. In addition, downloads of Ducksworth, Jr.'s and McCaa's phone reflect evidence of this trip, including their rental of a Mercedes which they drove between Las Vegas and California. On November 30, 2022, at approximately 1:15 p.m., McCaa and Ducksworth, Jr. were stopped by Highway State Patrol in Las Vegas. McCaa was driving 103 mph in a rented Mercedes. During the stop, McCaa told the officer they were staying in Las Vegas and were going to Los Angeles to buy clothes and other items. Not only were the suspected drug parcels mailed from California, but McCaa also appears to be wearing the camouflage/black and white sweatshirt under his jacket during the traffic stop. A still image from the body cam footage is below. McCaa is in the driver's seat and Ducksworth, Jr. is in the front passenger seat:

11



12